COMBS *v.* BAKER.

4-6586                                                    158 S. W. 2d 48

Opinion delivered January 26, 1942.

*Chas. F. Cole,* for appellant.

*R. W. Tucker,* for appellee.

GRIFFIN SMITH, C. J.   The appeal is from a decree denying specific performance.

February 9, 1940, Edgar Baker and his wife, Leona, contracted with Loyd Summars, M. R. Meals, and J. A. Bauer.[1] The writing lists certain real property belonging to the Bakers, which they desired to sell at auction as a whole or subdivided.   Some of the lands were mortgaged to C. M. Edwards for $5,600.   The exclusive right was given Summars, Meals, and Bauer to sell such property, the cash payment to be not less than 50 per cent. of selling price.   From any money received in excess of $5,600, a sales commission of 15 per cent. of the full contract price was specified.   The Bakers, hereinafter referred to as appellees, reserved the right to reject any bids not considered fair.   On rejected bids Summars, Meals and

---

[1] J. A. Bauer is referred to in the briefs as Mrs. J. A. Bauer. She resided at Memphis, Tenn., as did Summars, Meals, and H. W. Combs.

Bauer were to receive a commission of five per cent. of the best offer. They were to advertise the proposed sale by radio, signs, and hand bills; also through newspaper and magazine, "by direct mailing," and otherwise. The contract does not show how the purchase price in excess of 50 per cent. was to have been paid, or when.

The property was offered at auction in Batesville April 4, 1940. Sale was continued until the following day. Meals served as auctioneer, although Summars also was of the profession.

Summars testified that after lots and tracts had been offered, separately, it was suggested that the property covered by Edwards' mortgage be auctioned. It was Summars' recollection that when this land [2] was offered, Edwards made a bid of $6,500. On behalf of H. W. Combs, Summars increased the Edwards bid. Finally, according to Summars, Edwards bid $7,250, and he (Summars), as agent, offered $7,500 without disclosing his principal. Combs was not present. When asked by the court what kind of a contract he had with Combs, Summars replied, "None whatever at the particular time." He further testified that when he bid $7,500, Edgar Baker raised his hands and said, "Let it go." This testimony was corroborated.

Meals testified that Edwards' bid was $7,400, and that Summars raised the offer by $100. Meals also testified that Baker told him to "strike the property off to Summars."

When Baker declined to recognize the sale, Combs brought the instant suit. Summars, Meals, and Bauer intervened, claiming a commission of 15 per cent. This cause was transferred to circuit court.

Mrs. Bauer testified that she acted as clerk. It was customary to do this, "and to inform the ringmaster to contact the person making the last bid, and see who the item should be charged to." The "ringmaster" would take bids from anyone present or absent. It was her

---

[2] Summars spoke of this property as "The land in the eastern part of the county and the town lots—that is, the property in the complaint."

understanding that some persons do not like to have their identity known when bids are made in their behalf, ". . . therefore he informs the ringmaster, who makes the bids for him." Mrs. Bauer's records showed that Summars was the high bidder; that he acted for Combs, and the sale was confirmed by Baker, who met with the witness and her associates at the hotel the night of April 5th. Baker left, saying he would return, but failed to do so.

The court asked Mrs. Bauer how bids made in behalf of undisclosed buyers were enforced. Her answer is printed in the margin.[3]

Other witnesses supported the allegation that Summars made the highest bid, and that Baker directed acceptance.

This testimony was disputed by Baker, who insisted that he rejected all bids. Edwards, according to Baker, was "high" on the mortgaged property. Certain lands included in the contract were not owned by Baker, but at the request of Summars, Meals, and Bauer, he procured an option. Baker admitted meeting at the hotel with the trio, but insisted the only demand then made was for five per cent. of the rejected bid. There was no tender of the alleged purchase price. Combs was unknown to Baker until suit was filed. Summars had his bids listed in the name of "Mr. Sells."

Edwards, the mortgagee, testified that Summars bid $7,500 on the lands in question, but his understanding was that Baker rejected the offer. Summars talked to Edwards about the mortgage, and ". . . wanted to know [whether], if he could get up the money, he could take it up—let me assign it to him. He asked me about purchasing it."

Other witnesses testified that Baker rejected the final bid.

---

[3] "I guess the only way I can explain to you is that the ringmaster, conducting the sale, knows who the bids are made for. If a man for whom a bid is being made, or any other person, for that matter, ever 'welches' on a bid, he is in disgrace with the profession. Often a wink of the eye or a lift of the finger means something."

The cause was tried on oral testimony. The answer of Summars that he had no contract whatever with Combs at the time the property was offered for sale, while modified by explanations, is significant, and must have impressed the judge.

Fifteen per cent. of $7,500 is $1,125. This amount, if subtracted from the bid, would leave $6,375, or $875 less than Edwards' bid of $7,250. Just what Mrs. Bauer meant when she testified that in auctioning property "a wink of the eye, or a lift of the finger, often mean something," is not explained. (See third footnote.) Nearly all of the witnesses are interested parties. The court seems to have taken the view that Combs' authority to Summars was either (1) an afterthought, the plan having been promulgated to assist the three contracting auctioneers in realizing the maximum commission of 15 per cent.; or, (2) that the arrangement so consummated was contrary to public policy; or, (3) that Baker rejected the bid. Either theory can be sustained.

If Summars had been called upon to immediately tender the purchase price there would have been default. The contract was that out of the first money received, $5,600 should be deposited in First National Bank of Newark to pay the Edwards note. Combs says he made a tender by wire. Whether there was actual payment of money to the telegraph company at its sending station, or merely a telegraphed offer to settle, is not shown. Summars, Meals, and Bauer obligated themselves to make the deposit.

A summary of court decisions relating to the right of an auctioneer to make bids on property he has contracted to offer for sale is to be found in American Jurisprudence, vol. 7, § 21, p. 459. After stating that there is some authority to the contrary, the editor says it is generally held that an auctioneer may not act as agent for a third person in bidding unless the seller has given his consent. It is then said: "He may, however, undertake an agency simply to bid a particular sum for a purchaser, amounting to no more than receiving from the purchaser, before the auction, a bid which is to be treated as if made

there by the purchaser himself." A note is: "It is impossible in good faith to combine the inconsistent capacities of crier and bidder in one and the same transaction. If the auctioneer faithfully discharges his duties, he will, of course, honestly obtain the best price he can for the property. On the other hand, if he undertakes to become the purchaser for another, his interest and his duty alike prompt him to obtain the property upon the most advantageous terms." See, also, Mechem on Agency, Second Edition, § 2331, pp. 1916-17; 7 C. J. S., § 7, sub. div. "i," p. 1259.

*Robeson & Weaver, et al.* v. *Ramsey, et al.,* 147 Tenn. 25, 245 S. W. 413, is a case in point. The opinion was written by Judge GRAFTON GREEN, now chief justice of the Tennessee Supreme Court. He said: "The general rule is that an auctioneer will not be allowed to buy or bid on property offered by him for sale. 6 C. J. 834; 2 R. C. L. 1127. This is but an application of the rule that an agent will not be permitted to put himself in a position where his interests are inimical to those of his principal. This doctrine was stated years ago by Judge CARUTHERS in language that has been quoted in textbooks and other decisions so frequently that its origin has been lost sight of, even by the profession of this state." [4]

---

[4] The comment credited to Judge Caruthers follows:

"It is one of the canons of a court of equity, that one who undertakes to act for others, cannot in the same matter act for himself. Where confidence is reposed, duties and obligations arise, which equity will enforce. A trustee cannot throw off the trust at pleasure, to the injury of the *cestui que* trust. He will not be allowed to mix up his own interests and affairs with those of the beneficiary. This doctrine has its foundation not so much in the commission of actual fraud, but in that profound knowledge of the human heart, which dictated that hallowed petition, 'Lead us not into temptation, but deliver us from evil,' and that caused the announcement of the infallible truth, that a 'man cannot serve two masters.' The right to sell, and to buy, cannot exist in the same person, because of the antagonistic interest in the two positions. Hence the fairness or unfairness of the transaction, and the comparison of price and value, or the existence or absence of actual fraud, are not permitted to enter into the consideration of the court. It is enough that the relation of trustee, and *cestui que* trust, existed. This appearing, the investigation is at an end, and the doctrine applies with all its force. It is certainly too late in the day to require the citation of authorities to establish this doctrine. But they may be found collected (609) in the cases of *Keech* v. *Sandford,* 47 to 58, and *Fox and Pitt* v. *Mackreth,* 105 to 146, 1 White & Tudor's Leading Cases, In Equity, as to the two aspects in which we have discussed this case." *Tisdale* v. *Tisdale,* 34 Tenn. (2 Sneed.) 596, 608, 64 Am. Dec. 775.

608

In the case at bar Summars was not the acting auctioneer. But he was a party to the Baker contract and occupied the relationship of a partner with Meals and Bauer in respect of compensation.

Public policy forbids one so closely associated with an auctioneer as Summars was with Meals to represent an undisclosed principal in competitive bidding in the circumstances disclosed by the appeal.

Affirmed.